IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NIKITA PETTIES, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE DISTRICT OF COLUMBIA, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 95-0148 (PLF)<br><br>OSM Case No. 35.2 et. seq.<br>  Hearing Proceedings |

**REPORT AND RECOMMENDATIONS OF THE SPECIAL MASTER
IN THE MATTER OF INTERDYNAMICS, INC.**

This report is filed pursuant to the November 8, 2004 Payment Order ("Payment Order"). Interdynamics, Inc. ("Interdynamics") is a mental health and educational support company providing services in Maryland and the District of Columbia. Between May 2008 and April 2009, Interdynamics submitted several hundred invoices to the District of Columbia Public Schools ("DCPS") for various evaluations of students conducted between April 2008 and February 2009. Most of the invoices were for the conduct of independent evaluations for which DCPS had already established and published rates in two (2) documents: the Superintendent's Directive 530.6 dated March 20, 2002 ("2002 Rate Directive") and the Chancellor's Rate Directive dated July 9, 2008 ("Chancellor's Directive").[1] The rates billed by Interdynamics were higher than those on the two Directives, and when DCPS refused to pay the difference the instant dispute was filed with the Office of the Special Master.

---
[1] The remaining invoices –discussed further below - involved services that are not listed on one or both Directives.

**BACKGROUND**

In addressing the dispute, the issue for adjudication was formulated as follows, "Did DCPS err when it failed to pay invoice X in full? If yes, what is the appropriate remedy?" The parties and the Special Master agreed that four (4) circumstances could give rise to this question:

1. Where the document ordering an independent evaluation, such as a Hearing Officer Determination ("HOD") or settlement agreement ("SA") or authorization letter[2] expressly references a "reasonable," "prevailing" or "market" rate for the evaluation. (e.g., "DCPS shall fund and the parent shall obtain an independent neurological evaluation and a Woodcock Johnson at prevailing market rates." Hearing Officer Determination re Chadwick B., October 8, 2008, at 7)

2. Where the authorizing document is silent as to the amount to be billed for the evaluation. (e.g., "DCPS shall fund an independent psychiatric evaluation and an independent neuropsychological evaluation for Student." Due Process Consent Order re Christopher M., February 25, 2008, at 3)

3. Where the authorizing document states that the Directive should be disregarded. (e.g., "Petitioner shall obtain the following independent evaluations and is not bound by 5 D.C.M.R. Section 3027.5 . . ." Hearing Officer Determination re Michea H., August 1, 2008, at 5)

4. Where the authorizing document expressly states that the cost of the evaluation is bound by the Directive. (e.g., "According to the

---

[2] Such documents hereinafter referred to as "authorizing documents."

2

Superintendent's Directive 530.6, DCPS will fund a comprehensive psychological evaluation and a social history of the student." Hearing Officer Decision re Terrence W., October 4, 2008, at 4)

The first part of the resolution process was a hearing to determine whether, or not, Interdynamics had billed at reasonable, prevailing or market rates. A Report and Recommendation filed by the Special Master on October 12, 2010 found that Interdynamics had failed to present sufficient evidence to prove that the rates it billed were reasonable or prevailing.[3] Specifically, the Report included the following findings: 1) Interdynamics did not introduce evidence that other companies providing substantially the same services invoice at rates comparable to those billed by the plaintiff; 2) Interdynamics did not introduce evidence that other agencies or clients pay the rates that plaintiff bill DCPS; and 3) the methodology used by Interdynamics to establish its rates was not internally coherent or consistent with general principles of accounting. See Report and Recommendations of the Special Master in the Matter of Interdynamics, Inc., October 12, 2010 (Dkt. 1834), affirmed December 6, 2010 (Dkt. 1855)

The parties were directed to prepare for another evidentiary hearing at which DCPS would be asked to produce its case in support of the amounts paid to Interdynamics for the services billed on the disputed invoices.

Pursuant to the December 6, 2010 Court Order the parties convened before the Special Master on September 7, 2011 for a presentation of the defendant's case. During the presentation, testimony was taken from Mr. Gregory Hall of DCPS' Billing Unit, and a number of exhibits were provided, including charts detailing rates paid by DCPS to various related

---

[3] Interdynamics presented its case at evidentiary hearings held on February 2 and 4 of 2010.

service professionals. At the conclusion of the hearing, DCPS was directed to reformat and resubmit the charts for easier review. On November 25, 2011, DCPS resubmitted the charts it had introduced at the September 7 hearing.

Following an analysis of the record including DCPS' revised charts, the Special Master informed all parties that DCPS had not clearly established the reasonableness of the rates it paid for the disputed invoices. This conclusion was based on the fact that DCPS failed to provide support through live testimony, or even by affidavit, that the rates offered by the District are similar to those paid in surrounding jurisdictions.[4] Since neither party had been able to substantiate the reasonableness of their rates, the Special Master asked both the defendant and the plaintiff to submit one final offer for consideration along with an explanation of that offer. On Friday, September 14, 2012, counsel for the plaintiff submitted Interdynamics' "Motion in Support of its Requested Award."[5] DCPS' "Settlement Memorandum" was received on September 18, 2012.

**POSITIONS OF THE PARTIES**

In Interdynamics' submission, counsel provided a description of each evaluative service in question and an explanation of the time and effort involved in each service, along with a

---

[4] The closest DCPS came to proving that its rates were the prevailing rates in the community was the introduction of a document entitled "MANSEF Consortium Fee Range" at the September 7, 2011 hearing. "MANSEF" stands for the Maryland Association for Nonpublic Special Education Facilities. The MANSEF Consortium Fee Range lists ranges of amounts purportedly charged by a consortium of related service providers for services provided to Maryland students. Mr. Hall was unable to testify about the document because he did not develop it. Although formal Federal Rules of Evidence are generally not used in invoice dispute proceedings, in this case the plaintiff's inability to cross-examine the content of the MANSEF document was fatal. If DCPS had taken additional steps to secure testimony to corroborate the information contained therein, or was able at the least to describe the intended use of the document, a *prima facie* case might have been established.

[5] Three (3) separate revisions to Interdynamics' September 14, 2012 submission were received on September 21, 2012; January 18, 2013 and January 22, 2013. This Report references the version received on January 22, 2013 [hereinafter "January 22, 2013 Motion"].

4

comparison between the rates charged by Interdynamics and the rates claimed as reasonable by DCPS. Counsel for Interdynamics argued that to the extent the Special Master considers the rates listed by the Maryland Association for Nonpublic Special Education Facilities ("MANSEF") –and presented by DCPS as examples of reasonable rates – those rates "must be supplemented by a private provider's costs of doing business, such as employee life and health insurance coverage, paid vacation, paid sick/maternity leave, travel/parking subsidies or reimbursements, office rent, telephones, supplies, other overhead and, of course, profit." (January 22, 2013 Motion, at 23)

In its September 18, 2012 "Settlement Memorandum," DCPS did not offer to make any additional payments. The memorandum stated, in part:

> [a]t all times relevant to this case, Interdynamics was fully aware of the rates DCPS paid for evaluations listed on the Chancellor's Directive. DCPS paid the rates listed on the Chancellor's Directive. Interdynamics explained its IEE [Independent Education Evaluations] rates during the Dispute Hearing in February 2010. Their rates were not found to be reasonable or to be representative of other similarly situated evaluators. DCPS is not willing to pay additional public dollars to this vendor when the current rates are substantially lower than the Chancellor's Directive on IEEs. DCPS declines to make an offer to settle this dispute.
> (September 18, 2012 Settlement Memorandum, at 2)

**DISCUSSION AND FINDINGS[6]**

    1. <u>Invoices presenting issues regarding the application of either Directive</u>

Interdynamics arguments regarding the basis for administrative costs will be addressed first. According to Interdynamics, rates, such as those listed on the MANSEF sheet[7] "must be supplemented by a private provider's costs of doing business, such as employee life and health insurance coverage, paid vacation, paid sick/maternity leave, travel/parking subsidies or

---

[6] This section addresses invoices according to categories established on page 2 of this Report.
[7] As discussed above, the MANSEF document is not dispositive in this case because DCPS did not establish the authenticity of the document or what the amounts listed on the document covered.

5

reimbursements, office rent, telephones, supplies, other overhead and, of course, profit." (January 22, 2013 Motion, at 23) It must be noted that last five (5) items listed above are administrative and profit, while the first four (4) items listed are *fringe benefits* which may be provided to employees. One of the difficulties in understanding the plaintiff's mechanism for determining and justifying its rates is its failure to identify which, if any, of its evaluators were "employees" as opposed to "independent contractors." If employees, what is the salary to which fringe benefits should have been applied? In the case of "independent contractors," while they may command a higher hourly rate, they are not entitled to fringe benefits according to the Internal Revenue Service. Put in other words, Interdynamics cannot have its argument applied both ways: The evaluations were either conducted by "independent contractors" who command high hourly fees and no fringe benefits, or "employees," who may receive fringe benefits along with a salary. What Interdynamics apparently seeks, however, is to add the cost of fringe benefits on to already high hourly fees of independent contractors.

With respect to the particular evaluations and invoices involved, Interdynamics has provided a description of services along with a comparison between the rates charged by Interdynamics and those claimed as reasonable by DCPS. Regarding five (5) of the services – neuropsychological, psychological, speech and language, occupational therapy and physical therapy – Interdynamics concedes that the DCPS rate directives allotted a sufficient number of hours for the evaluation. However, the parties do disagree over the base hourly rate for these evaluations.

| Evaluation | Base Hourly Rate DCPS will pay | Base Hourly Rate sought by ID |
|---|---|---|
| Neuropsychological | $200.00 | $250.00 |
| Psychological | $145.00 | $325.00 |
| Speech and Language | $90.00 | $150.00 |

| | | |
|---|---|---|
| Occupational Therapy | $90.00 | $150.00 |
| Physical Therapy | $90.00 | $150.00 |

Interdynamics argues that the rates DCPS offered were "well below market rate" or that the professionals used could "command [a] greater hourly rate on the open market." (January 22, 2013 Motion, at 8, 11, 15, 16 and 18) Unfortunately, the time for proving the market rate for these evaluations has long passed – Interdynamics had ample opportunity to present evidence in 2010 about the market rates in this community, but it failed to do so.

With respect to the remaining four (4) evaluations at issue - educational, audiology, social history and comprehensive psychological – Interdynamics disputes both the rates paid and the maximum number of hours DCPS will reimburse for the evaluation.

| Evaluation | Number of Hours DCPS will pay | Number of Hours sought by Interdynamics |
|---|---|---|
| Educational | 7 | 10 |
| Audiology | 2 | 4 |
| Social history | 2 | 4 |
| Comprehensive Psychological | 14 | 21 |

It is important to note that Interdynamics does not itemize the number of hours and minutes spent on any particular evaluation. Instead, the same flat fee is charged each time a particular evaluation is conducted. Looking at what the evaluation entails – and having some familiarity of the challenges presented by the students being evaluated - one can assume that a particular evaluation might take longer than DCPS' maximum offer. But it is difficult to believe that every single evaluation of a particular type will take the same amount of time. Moreover, in two situations – audiology and comprehensive psychological – the number of hours Interdynamics requests factors in time that might be spent attending due process hearings. In the case of audiology, approximately ten (10) percent of Interdynamics'

7

evaluations require time spent preparing for and attending subsequent (due process) hearings; that percentage rises to forty (40) in the case of comprehensive psychological evaluations. But even by Interdynamics' own representation, six out of ten comprehensive psychological evaluations will not result in further hours spent preparing for and attending a due process hearing.[8] Whether and how evaluators should be paid for participating in meetings and hearings is beyond the scope of this case, but whatever that answer is, the answer cannot be that DCPS is required to pay for those additional costs in the case of every single comprehensive psychological or audiological evaluation. In electing to invoice without reference to the actual time spent on any particular case, Interdynamics does not provide any way to ascertain which set of extraordinary circumstances might warrant an exception from DCPS' maximum allowance.

There is no question that the individuals who conducted these assessments were committed to the highest quality of evaluative services. This is laudable. Nevertheless, it is the responsibility of each company doing business with an agency like DCPS to know and understand DCPS' policies. Here, Interdynamics knew the rates published on both Directives but did not think they could retain qualified evaluators for the rate offered or the number of hours allowed. Indeed, in a response to a July 7, 2008, Notice of Dispute, counsel for the provider stated that, "Interdynamics believes that exceptions to DCPS' established Superintendent's cost guidelines are warranted for the following reasons: 1. The current rate of compensation for Independent Contractors (clinicians that Interdynamics utilizes to conduct evaluations) far exceeds the 2002 established guidelines. . ." With knowledge of the published rates, that left Interdynamics with the option of refusing requests to evaluate DCPS students, or

---

[8] See January 22, 2013 Motion at 14, 18

8

taking a risk that the amount billed would not be paid. This same conflict was addressed in an earlier report by the Special Master as follows:

> [Interdynamics] took the risk that DCPS would either voluntarily pay the full amount or be compelled to pay the full amount through this or some other forum. That was a risk that Interdynamics chose to take and it is Interdynamics risk to bear.
> See Report and Recommendations of the Special Master in the Matter of Interdynamics Inc., September 25, 2008 (Dkt. 1834), affirmed March 3, 2009 (Dkt. 1600)

For the above reasons, the final offer of Interdynamics cannot be accepted in its entirety. This finding applies to the invoices where the authorizing document expressly referred to "reasonable," "market" or "prevailing" rates. See Appendix Table 1 for a description of the sixty-five (65) entries that fall within this category. This is true as well for those instances in which the authorizing document is silent as to the rates to be paid. See Appendix Table 2 for a description of the sixty-three (63) entries that fall within this category.

2. Invoices based on authorizing documents that restrict the application of the Directive(s)

The rationale above is not applicable to invoices that arise from an authorizing document that specifically states the Directive(s) should be disregarded. In these instances, payments cannot be limited to an amount on a rate list that a Hearing Officer expressly rejected. The rejection of a Directive as authority would not necessarily lead to the adoption of the rate Interdynamics seeks. However, DCPS did not propose any alternate rate, and made no effort to reach an accommodation or compromise with Interdynamics. Since there is no alternative rate on the table, the amounts initially billed by Interdynamics should be due. See Appendix Table 3 for a description of the seven (7) entries that fall within this category.

However, within the evaluations described above, the two (2) evaluations conducted for student Elliot E. were: 1) a comprehensive psychological and; 2) a social history. It has been determined that a social history is a normal component of a comprehensive psychological and cannot be billed as a separate invoice. See Report and Recommendations of the Special Master in the Matter of Diagnostic Consultants, LLC, November 11, 2011 (Dkt. 1951), affirmed April 10, 2013 (Dkt. 2081) A deduction for the separately billed social history is reflected in the final accounting in the Proposed Order.

    3.    <u>Invoices based on authorizing documents that limit reimbursement to the amount on the Directive(s)</u>

Conversely, where the document authorizing the evaluation expressly specified that the cost of the evaluation should be *bound* to the applicable rate directive, there can be no question of any further payment to the provider. Whether the limitation was contained in an HOD or settlement agreement, the Special Master has no authority to amend or alter such document. See Appendix Table 4 for a description of the nine (9) entries that fall within this category.

    4.    <u>Invoices for evaluations that are not on listed on either Directive</u>

There are forty three (43) entries billed for services that are not listed on the Chancellor Directive. DCPS argues that the amounts it has offered in these instances are appropriate even though those amounts are not part of a published schedule. For each of the evaluations in this category, the defendant failed to furnish a copy of a published rate. Instead, the provider received communications that stated, in pertinent part, that "[t]he disputed charges on the subject invoice are inappropriate and cannot be approved for payment based on current documentation. Invoice was partially disputed based on the monetary amount allowed (for the service rendered)." In most cases, the attached billing sheets included the comment:

"[E]xceeds reasonable and documented fees." The lack of specificity in this matter is inconsistent with Section V (a) of the Payment Order which requires the defendant to submit a detailed description of the basis for the dispute as well as copies of any and all policies relied on as a basis for the objection. Accordingly, the defendant's dispute cannot be sustained. This conclusion should not come as a surprise to the defendant as this issue has arisen before.[9] What is a surprise, however, is the defendant's failure to rectify this problem through the adoption and publication of rates for assessments that are ordered by Hearing Officers.

By way of background, prior to 2002, DCPS had no written policy, regulation, or directive regarding the amounts it would pay for independent evaluations. On March 20th of that year, Superintendent Paul Vance signed Superintendent's Directive 530.6 ("Superintendent's Directive") which listed eleven (11) types of evaluations and the amount that DCPS was prepared to pay providers for those services.[10] In December 2005, when the Superintendent's Directive was still in effect, the question of the amount owed for a functional behavior assessment ("FBA") surfaced in a case arising as a Motion for a Preliminary Injunction in <u>Blackman v. District of Columbia</u>, No. 97-1629 (PLF) (D.D.C.).[11] In its argument, the defendant contended that the $3,036.00 billed for the FBA was too high. According to DCPS, it "typically reimbursed independent evaluators in the neighborhood of $560.00 for FBAs." See <u>Blackman v. D.C</u>., Report and Recommendation of the Special Master, December 22, 2005, at 3. Nevertheless, the Superintendent's Directive was not amended and no policy was articulated in any document citing this as a standard rate.

---

[9] See <u>Report and Recommendations of the Special Master in the Matter of Diagnostic Consultants, LLC</u>, November 11, 2011 (Dkt. 1951), affirmed April 10, 2013 (Dkt. 2081)
[10] The methodology used to arrive at the rates was not made public and counsel for the <u>Petties</u> class objected to its implementation.
[11] The Superintendent's Directive did not list a rate for functional behavior assessments.

Meanwhile, in December 2006, the "Placement of Students with Disabilities in Nonpublic Schools Amendment Act of 2006," (D.C. Law 16-0269, D.C. Official Code § 38-2561.01 et seq.) was enacted. Section 112 of that legislation provided that:

> The mayor, or his designee shall administer and implement a rate-setting process for the payment of tuition and related services to the nonpublic special education schools and programs that provide special education and related services to students with disabilities funded by the District of Columbia.

Mayoral Order 2007-149 became effective on June 28, 2007, and it assigned rate-setting authority to the Office of the State Superintendent of Education ("OSSE"). During the period that OSSE's functions were being established, DCPS issued the Chancellor's Directive which remained in effect until OSSE published rates on August 1, 2011.[12]

During that interim period, a dispute was filed under the Payment Order that included an invoice for a service – Adaptive Behavior Skills Assessment - that was not on the Superintendent's Directive or the Chancellor's Directive. A report and recommendation was issued in that case which observed that Section V (a) of the Payment Order required DCPS to provide a detailed description of the basis for the dispute. The report found that DCPS' Notice of Dispute and its accompanying material did not provide adequate information, inasmuch as a rate for the evaluation under review had never been published or furnished. See Report and Recommendations of the Special Master in the Matter of Interdynamics Inc., September 25, 2008 (Dkt. 1538), affirmed March 3, 2009 (Dkt. 1600)

---

[12] In light of the authority granted by the Mayoral Order, on June 18, 2010 OSSE proposed regulations establishing ". . . a comprehensive regulatory framework for a uniform rate methodology for special education services." (57 D.C. Register 5263) A new proposed rulemaking action was issued by OSSE on March 25, 2011. That document proposed new rates for tuition, related services, as well as many independent evaluations. The rates and regulations were finalized and published on July 1, 2011 as Chapter 28, subtitle A, of Title 5 of the DC Municipal Regulations. They came into effect on August 1, 2011 in time for the start of the 2011-2012 academic year.

To date, no rate has been published for functional behavioral assessments or adaptive behavior skills assessments. Although no formal written argument has ever been submitted by DCPS or OSSE, discussions during hearings suggest one explanation for the absence of a rate for an FBA, at least. An FBA is an evaluative tool used to examine the relationship between problem behavior and classroom environment and other factors. Based on changes to the Individuals with Disabilities Education Act in 2004, an FBA is required when a student's placement is changed based on behavioral issues.[13] The view of the special education program leadership is that a FBA is a tool that can and should be used by school level personnel and thus should be part of the regular tuition costs, whether public or nonpublic.

Obviously, an FBA is a service that should be available in every school. But the context in which this issue arises in the District of Columbia is where – for whatever reason – a parent has not been satisfied at the school level, the parent has obtained counsel and a Hearing Officer has ordered the execution of an FBA. What could have been or should have been is no longer relevant at this juncture. The sole question is, what is the reimbursable rate for a functional behavior assessment?

Hopefully, OSSE's current mechanism for assessing and publishing appropriate rates for independent evaluations can be applied to adaptive behavior assessments, functional behavior assessments, neurological evaluations, vision screening, and vocational assessments - evaluations periodically ordered by Hearing Officers for which no formally published rates

---

[13] Implementing regulations to 2004 amendments to section 615(k) of the IDEA were published in the Federal Register on August 14, 2006, and became effective on October 13, 2006. See 34 CFR 300.530 (d)(1)(ii) and (f)(1(ii) which entitle a student whose behavior is a manifestation of his or her disability to "[r]eceive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur."

currently exist.[14] It is recommended that the disputed amounts for evaluations not appearing on the Chancellor's Directive be paid.

   5. <u>Invoices presenting issues involving the weight of the authorizing documents</u>

There are thirteen (13) invoices for which the sole authorizing documents provided by Interdynamics are copies of Multi-Disciplinary Team (MDT) notes. No Hearing Officer Decisions, settlement agreements or authorizing letters have been provided in these instances. In a previously filed Report and Recommendation, the Special Master has held that while "[t]here may be room to argue that meeting notes can amplify or explain services discussed during the development of a new IEP, [t]here is no authority [. . .] for the proposition that new services can be added for a student without the development of a new IEP." <u>See</u> <u>Report and Recommendation of the Special Master in the Matter of Independence and Dependence</u>, November, 14, 2012 (Dkt. No. 2045), at 12, affirmed February 27, 2013 (Dkt. 2074) In a similar manner, while MDT notes in this matter may amplify or explain discussions held at a team meeting, absent an Individualized Education Plan, HOD or SA, the notes are inadequate to obligate payment for a service. Accordingly, additional payment for services in this category should be denied.

In conclusion, it is recommended that DCPS be ordered to pay Interdynamics $45,218.84.[15] A proposed Order is attached. Counsel for defendants and plaintiffs may raise

---

[14] Of the assessments that were not listed on the 2002 Directive, four (4) were not listed on the 2008 Chancellor's Directive: psychological cognitive, educational, psycho-educational and clinical psychological. It may be that these evaluations are now considered subsumed within an evaluation that was listed, e.g., comprehensive psychological. But again, no detailed information was furnished to the provider with the Notices of Disputes explaining this possible change in policy, and no written information on why evaluations that were on the 2002 Superintendent's Directive were no longer on the Chancellor's Directive was provided. Since the evaluations in question were conducted after July 2008, they were governed by the Chancellor's Directive and more specific information about the bases for denial were required by Section V (a) of the Payment Order.

[15] Parties submitted a joint exhibit of pending invoices on January 13, 2010. The defendant has not indicated that any further payments have been made since that submission. Accordingly, this amount is calculated based on the entries made on the January 13, 2010 joint exhibit.

any objections or defenses to the Special Master's Report and Recommendation in accordance with Rule 53 of the Federal Rules of Civil Procedure.

>Respectfully submitted,
>
>Elise Baach
>Special Master

DATE: April 26, 2013.